The **POWER COMPANY
OF AMERICA, L.P.,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

**PG&E Energy Trading–Power,
L.P., et al., Intervenors.**

**Nos. 99–1263 & 99–1333.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 16, 2001.

Decided April 17, 2001.

Daniel Joseph argued the cause for petitioner. With him on the briefs were Merrill L. Kramer and Beth L. Hirschfelder.

David H. Coffman, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was Dennis Lane, Solicitor. Susan J. Court, Special Counsel, entered an appearance.

Earle H. O'Donnell argued the cause for intervenor PG&E Energy Trading–Power, L.P., et al. With him on the brief were Donna M. Attanasio, Bruce A. Grabow, David P. Sharo, Jacob Dweck, Daniel E. Frank, Paul B. Turner, Terry D. Kernell and David I. Bloom. Joseph R. Hartsoe and Jeffery D. Watkiss entered appearances.

Before: EDWARDS, Chief Judge, GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

These are petitions for judicial review of a Federal Energy Regulatory Commission ruling that a 60–day notice-of-termination rule does not apply to power sales contracts terminated by 21 of the counterparties of the Power Company of America (PCA).

PCA is a power marketer. As such, it buys and sells wholesale electricity at market-based rates but does not own generation or transmission facilities. It purchases electricity from other power marketers and from traditional utilities. In contrast to power marketers, traditional utilities not only buy or sell electricity, they also own generation or transmission facilities. Power marketers and traditional utilities receive different regulatory treatment, especially in regard to the transaction documents they are required to file with the Commission.

During the summer of 1998, several entities terminated their contracts to sell power to PCA, purportedly because of PCA's weak financial condition. PCA's creditors then forced it into involuntary bankruptcy.

The present dispute is about the notice PCA's counterparties had to give before unilaterally terminating their contracts. Those contracts apparently do not address the matter of notice, but PCA claims a Commission regulation does. The regulation requires 60 days notice to the Commission to terminate "a rate schedule or part thereof required to be on file with the Commission." 18 C.F.R. § 35.15(a).[1] The issue, then, is whether the terminated contracts were "required to be on file with the Commission." The canceling parties filed notices with the Commission as a precautionary measure, but not sufficiently far in advance to satisfy PCA. The Commission dismissed the notices as not required: all of the canceled transactions were "short-term power sales made from time to time

---

1. The relevant provision states in its entirety: "When a rate schedule or part thereof required to be on file with the Commission is proposed to be cancelled or is to terminate by its own terms and no new rate schedule or part thereof is to be filed in its place, each party required to file the schedule shall notify the Commission of the proposed cancellation or termination on the form indicated in § 131.53 of this chapter at least sixty days but not more than one hundred-twenty days prior to the date such cancellation or termination is proposed to take effect." 18 C.F.R. § 35.15(a).

at the discretion of the parties," and, as such, did not have to be on file under 18 C.F.R. § 35.15(a). *See Southern Co. Energy Marketing, L.P.*, 84 F.E.R.C. ¶ 61,-199, at 61,986–87 & n.3, 1998 WL 656733 (1998).

## I. Jurisdictional Issues

### A. Standing

■ PCA concedes that the contracts at issue have been "irrevocably cancelled." Final Brief of Petitioner at 34. The Commission did not cancel the contracts; private parties did, many of whom are not party to this suit. It is not obvious that PCA can show an "injury in fact" that is "fairly traceable" to the Commission's actions and that will likely be "redressed by a favorable decision," as Article III requires. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C.Cir.1998) (en banc).

PCA's ultimate injury is the termination of its contracts. Although the Commission did not terminate them, it acquiesced in their termination by others. If, as PCA claims, the Commission had a duty to prevent those terminations by requiring more notice than was given, then PCA's injury is two-fold—the terminations by others, and the Commission's failure to prevent this. In these circumstances, the latter injury is cognizable. The "loss of a valuable contractual interest in a licensee is an injury sufficient to invoke our jurisdiction." *Tele-*

*phone and Data Sys., Inc. v. FCC*, 19 F.3d 42, 46 (D.C.Cir.1994). The injury is directly traceable to the Commission's alleged nonfeasance. *See id.* at 47; *see also Animal Legal Defense Fund*, 154 F.3d at 440–42.

Redressability is another matter. PCA is not asking for damages or injunctive relief in this court, although it is seeking such relief elsewhere. PCA stated that the Commission "has the power to fashion any number of remedies, and PCA would ask FERC to use that power if this Court holds that violations of the FPA and FERC regulations have occurred." Final Reply Brief of Petitioner at 4. The Commission does not dispute that it has remedies for unlawful contract terminations. In holding that the terminated agreements were not subject to the notice-of-termination rule, however, the Commission effectively held that the contracts were legally terminated. As such, no contract remedies will be forthcoming if the Commission's determination stands. In these circumstances, a declaratory ruling that the terminations at issue are subject to the notice requirement is a "'necessary first step on a path that could ultimately lead to relief fully redressing the injury'." *Telephone and Data Sys.*, 19 F.3d at 47; *see also Hazardous Waste Treatment Council v. U.S. EPA*, 861 F.2d 270, 273 (D.C.Cir. 1988). PCA is in the same position as the litigants who had standing in *Telephone and Data Systems*—they will not necessarily prevail if we overturn the Commission, but they "cannot prevail unless we do so." 19 F.3d at 47.[2]

---

2. We disagree with the Commission that *New York State Elec. & Gas Corp. v. FERC [NYSEG]*, 117 F.3d 1473 (D.C.Cir.1997), defeats standing. *NYSEG* did not even deal with standing. The jurisdictional defect there was the suit's incompatibility with Congress' distribution of functions between the district

courts and the courts of appeal. Entertaining that appeal would have deprived the district court of its enforcement function under the Public Utility Regulatory Policies Act. *See NYSEG*, 117 F.3d at 1476–77. Entertaining the present appeal, by contrast, would not

### B. Failure to Properly Intervene and Obtain Party Status

■ The Commission treated each contract termination as a separate proceeding and assigned each its own docket number, though it disposed of them on a consolidated basis. PCA sought to become a party to each proceeding by intervention. The Commission permitted PCA to intervene in most proceedings but denied intervention in the six proceedings involving Idaho Power Co.; PG&E Energy Trading–Power, L.P.; South Jersey Energy Co.; Vitol Gas & Electric LLC; El Paso Energy Marketing Co.[3]; and Cook Inlet Energy Supply, L.P. *See New York State Elec. & Gas Corp.*, 85 F.E.R.C. ¶ 61,196 (1998) (denying PCA's motions to intervene in the Vitol and Cook Inlet proceedings); *Southern Co. Energy Mktg. L.P.*, 86 F.E.R.C. ¶ 61,131, 1999 WL 63539 (1999) (denying intervention in the Idaho Power and South Jersey Energy Co. proceedings); *PG&E Energy Trading–Power, L.P.*, 86 F.E.R.C. ¶ 61,303, 1999 WL 171448 (1999) (denying intervention in the PG&E Energy and El Paso proceedings). As a consequence, PCA was not party to these six proceedings.

We have no jurisdiction over proceedings in which PCA is not a party because only "part[ies] to a proceeding" may seek judicial review under the Federal Power Act. *See* 16 U.S.C. § 825*l*(b). The Commission concluded that PCA did not properly intervene and therefore did not become a party to these six proceedings. PCA did not file timely motions to inter-

vene, and the Commission was not obligated to accept untimely ones.

PCA claims that "FERC had no grounds on which to deny intervention." Final Brief of Petitioner at 35. Under the Commission's rules, however, the burden is on the untimely movant to show good cause to intervene. *See* 18 C.F.R. § 385.214(b)(3). PCA has not demonstrated good cause, certainly not to a degree sufficient to warrant our upsetting the Commission's application of its own procedural rule. PCA also asserts that the Commission arbitrarily considered only good cause, to the exclusion of four other factors identified in the rule. Final Brief of Petitioner at 36–38. Failure to establish good cause is, however, a sufficient condition to deny intervention, so the Commission was not obligated to consider any other factor. *See* 18 C.F.R. § 385.214(b)(3).[4]

## II. The Merits

PCA has four arguments: (1) the Commission erroneously viewed 17 of the 21 terminations as involving short-term discretionary sales; (2) the Commission's interpretation of 18 C.F.R. § 35.15(a) violates the Federal Power Act; (3) the Commission's interpretation violates the regulation itself; and (4) the Commission should have applied its new interpretation (assuming its validity) prospectively only.

### A. The Nature of the Terminated Transactions

PCA asserts that the Commission misconceived the nature of the terminated transactions, that 17 of them were umbrel-

---

frustrate the enforcement scheme of any statute. *See* 16 U.S.C. § 825*l*(b).

**3.** El Paso Power Services Co. is the successor-in-interest to El Paso Energy Marketing Co. *See PG&E Energy Trading–Power, L.P.*, 86 F.E.R.C. ¶ 61,303, at 62,055 n. 1, 1999 WL 171448 (1999).

**4.** The intervenors in this appeal argue that PCA did not properly intervene in the Enron proceeding. *See* Joint Brief for Intervenors at 21 n.8. The Commission to this point has treated PCA as a party to that proceeding and so will we.

la agreements or their functional equivalents. *See* Final Brief of Petitioner at 19–24. We have jurisdiction to consider only PCA's argument regarding 12 of the transactions because PCA was not a party to the proceedings involving the other five.[5] *See supra* section I.B.

■ One of the 12, Washington Water Power Company (WWPC), clearly did not terminate an umbrella agreement with PCA. WWPC's notices of termination stated that it was terminating transactions under the Western Systems Power Pool Agreement. *See* Joint Appendix at 358 & 657. While the Pool Agreement may constitute an umbrella agreement "required to be on file," WWPC could not have terminated it merely by terminating individual transactions under it. The Pool Agreement has numerous parties in addition to WWPC and PCA, and as such is not subject to termination by a single party. As the Commission put it in *Western Systems Power Pool*, 55 F.E.R.C. ¶ 61,495, at 62,-716, 1991 WL 266439 (1991), the "WSPP is an umbrella arrangement that will continue for at least ten years while members come and go over time. When one member leaves, the arrangement does not terminate." *See generally Western Systems Power Pool*, 55 F.E.R.C. ¶ 61,099, 1991 WL 265826 (1991).

■ We will assume *arguendo* that the remaining 11 cancellations were of umbrella agreements. PCA still must establish that these umbrella agreements were "required to be on file with the Commission." 18 C.F.R. § 35.15(a). If they were not required to be on file, they are not subject to the Commission's 60–day notice-of-termination requirement. PCA makes no attempt to prove this essential predicate.

As it turns out, the canceled agreements were not required to be on file, whether they were umbrella agreements or not. This is so because these 11 terminating counterparties were power marketers like PCA rather than traditional utilities.[6] The Commission, in its original order holding that notice of termination was not necessary, explained that for transactions "involving power sales by power marketers, there are no umbrella service agreements on file and likewise the particular transac-

---

5. The 12 transactions involve the following counterparties: ConAgra Energy Services, Inc.; Entergy Power Marketing Corp.; Griffin Energy Marketing, L.L.C.; Midcon Power Services Corp.; North American Energy Conservation, Inc.; British Columbia Power Exchange Corp.; Coral Power, L.L.C.; Enron Power Marketing, Inc.; New Energy Ventures, L.L.C.; New York State Electric & Gas Corp./NGE Generation Inc.; Southern Company Energy Marketing, L.P.; and Washington Water Power Company. *See* Final Brief of Petitioner at 20–23. The five transactions that we have no jurisdiction to review involve Cook Inlet Energy Supply, L.P.; El Paso Energy Marketing Co.; South Jersey Energy Co.; PG&E Energy Trading–Power, L.P.; and Vitol Gas & Electric LLC.

6. The Commission granted each of these 11 power marketers authority to sell power at market-based rates and required only the fil-

ing of quarterly reports. *See Griffin Energy Mktg., L.L.C.*, 81 F.E.R.C. ¶ 61,133, 1997 WL 832994 (1997); *Southern Co. Energy Mktg., L.P.*, 81 F.E.R.C. ¶ 61,009, 1997 WL 642313 (1997); *British Columbia Power Exch. Corp.*, 80 F.E.R.C. ¶ 61,343, 1997 WL 590161 (1997); *New York State Elec. & Gas Corp.*, 79 F.E.R.C. ¶ 61,303, 1997 WL 307846 (1997); *New Energy Ventures, Inc.*, 76 F.E.R.C. ¶ 61,-239, 1996 WL 507524 (1996); *Entergy Services, Inc.*, 74 F.E.R.C. ¶ 61,137, 1996 WL 718277 (1996); *In re Coral Power, L.L.C.*, Letter Order, Docket No. ER96–25–000 (Dec. 6, 1995); *In re ConAgra Energy Servs.*, Letter Order, Docket No. ER95–1751–000 (Oct. 23, 1995); *In re MidCon Power Servs. Corp.*, Letter Order, Docket No. ER94–1329–000 (Aug. 11, 1994); *In re North American Energy Conservation, Inc.*, Letter Order, Docket Nos. ER94–152–000 & ER94–9–000 (Feb. 10, 1994); *Enron Power Mktg., Inc.*, 65 F.E.R.C. ¶ 61,305, 1993 WL 499443 (1993).

tion terms were not on file." 84 F.E.R.C. ¶ 61,199, at 61,986 & n.3. The Commission further explained in its order on rehearing that "the filings by power marketers involved specific market-based power sales transactions that were neither on file with the Commission nor subject to any filed umbrella agreements, but were made pursuant to an umbrella tariff on file." 86 F.E.R.C. ¶ 61,131, at 61,455.

Power marketers are not required to file umbrella agreements, so the notice-of-termination regulation in 18 C.F.R. § 35.15(a) does not apply to umbrella agreements they terminate. Power marketers instead file umbrella tariffs and quarterly reports summarizing past transactions. *See* 86 F.E.R.C. ¶ 61,131, at 61,459 & n.36; *see also Heartland Energy Servs., Inc.,* 68 F.E.R.C. ¶ 61,223, at 62,065–66, 1994 WL 415138 (1994) ("the requirement that [power] marketers file quarterly reports detailing the purchase and sale transactions undertaken in the prior quarter is necessary to ensure that contracts relating to rates and services are on file, as required by section 205(c) of the FPA"); *supra* note 6. Traditional utilities, by contrast, are required to file umbrella agreements. *See Southern · Co. Servs., Inc.,* 75 F.E.R.C. ¶ 61,130, at 61,439, 61,444–45, 1996 WL 211950 (1996) (revising filing requirements for "short-term market-based rate transactions by non-power marketer public utilities" and requiring filing of umbrella agreements and quarterly reports). Because PCA never established that the contracts at issue are "required to be on file," it is irrelevant that PCA's power marketer counterparties might have canceled umbrella agreements or their functional equivalent.

We decline to address PCA's argument in its reply brief that the umbrella agreements were required to be on file because they were contained in quarterly reports that are required to be on file. *See* Final Reply Brief of Petitioner at 7–8. This argument was not raised in PCA's opening brief and is therefore waived. *See Rollins Environmental Servs. (NJ) Inc. v. U.S. EPA,* 937 F.2d 649, 652 n.2 (D.C.Cir.1991). The Commission's motion to strike the portions of PCA's reply brief that raise this argument is granted. Contrary to PCA's contention in its opposition to the Commission's motion to strike, the Commission's orders adequately apprised PCA of the need to raise in its opening brief the argument that the canceled transactions, whatever their nature, were required to be on file. *See* 84 F.E.R.C. ¶ 61,199, at 61,986 (Commission order stating that traditional utilities file umbrella agreements but power marketers do not); 86 F.E.R.C. ¶ 61,131, at 61,455 (rehearing order making the same distinction); *id.* at 61,459 (rehearing order stating that quarterly reports satisfy Federal Power Act filing requirement but are not rate schedules required to be on file under 18 C.F.R. § 35.15(a)).

### B. The Federal Power Act

PCA asserts that even if the Commission correctly treated the canceled transactions as short-term discretionary power sales, its refusal to apply the 60–day notice-of-termination requirement nonetheless violates the Federal Power Act. PCA first claims that the Commission's interpretation of its regulation contravenes the Commission's regulatory obligations. PCA has not identified with any specificity what regulatory obligations the Commission has shirked. It is not the court's role to fill in the blanks in counsel's argument.

PCA also seems to argue (the argument is not developed) that the Act's jurisdictional provision implies that the filing requirements cover the canceled transactions. The premises are obscure, but the reasoning apparently is that the Act covers

"sales," and the term "sales" contemplates actual transactions with agreed-upon prices and quantities, not umbrella agreements. *See* Final Brief of Petitioner at 25. Cancellation of individual transactions rather than of umbrella agreements presumably is, under this theory, the critical event because it implicates the Act's jurisdictional provision.

This syllogism ignores the determinative part of the Act—the part setting forth the filing requirements. Section 205(c) of the Act governs filing and states:

> Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

16 U.S.C. § 824d(c). The Commission has held that traditional utilities and power marketers who engage in market–based rate transactions are required to file quarterly reports summarizing transactions, and that these reports satisfy the filing requirements of § 205(c). *See* 86 F.E.R.C. ¶ 61,131, at 61,459. PCA has not even questioned the Commission's judgment in this regard so neither will we.

### C. The Commission's Interpretation of its Regulation

■ The Commission interpreted 18 C.F.R. § 35.15(a) as not applying to the canceled transactions because the agreements were not required to be on file, which is the predicate for the 60–day no-tice-of-termination requirement. *See* 84 F.E.R.C. ¶ 61,199, at 61,986–87; 86 F.E.R.C. ¶ 61,131, at 61,457. On rehearing, PCA pointed out that the Commission had previously applied the notice-of-termination rule to transactions like the ones at issue. *See Portland Gen. Elec. Co.,* 75 F.E.R.C. ¶ 61,310, at 62,002, 1996 WL 334361 (1996) (refusing to waive 60–day notice requirement in section 35.15 for terminating individual transactions); *Portland Gen. Elec. Co.,* 77 F.E.R.C. ¶ 61,171, at 61,639, 1996 WL 663866 (1996) ("we believe that the ability to unilaterally terminate a power sales contract without prior notice should be limited: (1) to contracts executed on and after July 9, 1996; *and* (2) to termination at the end of the contract"). In its Order on Rehearing, the Commission conceded that it "applied Section 35.15 to short-term power sale transactions in *Portland General*" but proceeded to "reverse any contrary language in *Portland General* indicating that Section 35.15 might apply to short-term discretionary power sales that are not themselves on file." 86 F.E.R.C. ¶ 61,131, at 61,457.

PCA claims that the regulation cannot sustain this reinterpretation. In PCA's view, the overruling of *Portland General* wrote the "part thereof" language out of § 35.15(a) without notice-and-comment rulemaking. In actuality, the Commission simply altered its view of what is "required to be on file," holding that the discretionary power transactions at issue were not in that class. 18 C.F.R. § 35.15(a); 86 F.E.R.C. ¶ 61,131, at 61,457. In doing so, the Commission merely narrowed the category of "rate schedule[s] or part[s] thereof" that are "required to be on file" (18 C.F.R. § 35.15(a)); it left the "part thereof" language undisturbed. The regulation does not forbid such narrowing.

### D. Retroactivity

■ In overruling *Portland General,* the Commission faced the choice of apply-

ing the new rule of law prospectively or retrospectively. It chose the latter course, a choice PCA attacks as arbitrary and capricious.

Administrative agencies have relatively more freedom to apply retroactively "new applications of law, clarifications, and additions" than "substitution[s] of new law for old law that was reasonably clear" because retroactive application of a wholly new rule may disrupt settled expectations and implicate fairness concerns. *Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1554 (D.C.Cir.1993). Viewing its retreat from *Portland General* as substituting new law for old, the Commission acknowledged that "the August 28 Order represented a change in interpretation of Section 35.15." 86 F.E.R.C. ¶ 61,131, at 61,457. The Commission proceeded to analyze PCA's claim for prospective-only application of the new rule under a three-factor test:

> (1) whether the rule is actually a departure from clear prior policy or instead a new policy for a new situation (or a clarification of a prior policy); (2) whether retroactive application will be more likely to hinder than to further the operation of the new rule; and (3) whether retroactive application would produce substantial inequitable results, with particular reference to whether parties relied on the old standard.

86 F.E.R.C. ¶ 61,131, at 61,457–58. It concluded that all three factors favored retroactive application, noting that participants in this market require flexibility to manage the terms and conditions of their transactions, that there is no purpose in the Commission's reviewing the termination of transactions whose terms and conditions were never required to be reviewed in the first place, and that PCA suffered no substantial inequity because "PCA knew that these individual power sales were not on file with the Commission, but rather were made pursuant to umbrella tariffs and/or umbrella service agreements on file." 86 F.E.R.C. ¶ 61,131, at 61,458–59.

■ The Commission's three-factor test differs slightly from the way we would go about deciding whether agency adjudications may be given retroactive effect.[7] The Commission's approach (and ours) also differs from Supreme Court retroactivity principles with respect to judicial rulings, under which court judgments must be applied retroactively with few exceptions. *See, e.g., Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); *Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995). We have not decided whether this line of cases applies to agency adjudications, and we will not make the decision here. *See District Lodge 64, Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. NLRB,* 949 F.2d 441, 447 (D.C.Cir.1991); *United Food & Commercial Workers Int'l Union, AFL–CIO, Local No. 150–A v. NLRB,* 1 F.3d 24, 35 (D.C.Cir.1993); *National Fuel Gas Supply Corp. v. FERC,* 59 F.3d 1281, 1289 (D.C.Cir.1995); *see also Laborers' Int'l Union of North America, AFL–CIO v. Foster Wheeler Corp.,* 26 F.3d 375, 386 n.8 (3d Cir.1994). No matter which line of authority one follows, the Commission's

---

7. We have framed the inquiry as follows: "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of the law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard." *Williams,* 3 F.3d at 1553–54; *see also Cassell v. FCC,* 154 F.3d 478, 486 n.6 (D.C.Cir.1998).

conclusion that the equities favor retroactive application cannot be faulted. The 60–day notice provision would have created a serious obstacle to competition in view of the fact that parties are entering into discretionary sales agreements that may last for only days or hours. The short duration of many sales in this market also vitiates PCA's reliance interest on a lengthy notice-of-termination period. To the extent PCA wished to rely on certain termination provisions, it could have put them in its contracts.

*Petitions denied.*