**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,**

v.

**EXPRESSTRAK, L.L.C., Defendant.**

**Expresstrak, L.L.C., Petitioner,**

v.

**National Railroad Passenger Corporation, Respondent.**

**Nos. CIV.A. 02–1773(RBW), CIV.A. 02–2012(RBW).**

United States District Court, District of Columbia.

Dec. 5, 2002.

Jack McKay, Shaw Pittman LLP, Washington, DC, for National Railroad Passenger Corporation, Plaintiff (02-1773 (RBW)).

John G. DeGooyer, Foley & Lardner, Washington, DC, for Expresstrak, LLC, Plaintiff (02-2012 (RBW)).

## MEMORANDUM OPINION

WALTON, District Judge.

This matter comes before the Court upon numerous filings by both parties, all revolving around the central issue of whether certain disputes arising from the parties' contractual relationship must be submitted to arbitration. Specifically, ExpressTrak, L.L.C. ("ExpressTrak") asserts that the disputes raised in National Railroad Passenger Corporation's ("Amtrak") complaint must be submitted to arbitration pursuant to an arbitration clause contained in a document that is entitled "Agreement Between Amtrak and ExpressTrak For Temperature Controlled Perishables Express Transportation" ("Operating Agreement"), which is the original agreement that defined the parties' contractual relationship. Amtrak, on the other hand, submits that the disputes between the parties arise from leases that were subsequently executed, which contain provisions rescinding the Operating Agreement's arbitration clause. A corollary issue presented to the Court is ExpressTrak's position that if the Court orders that this case to be sent to arbitration, it should also issue an injunction requiring Amtrak to continue conducting business with ExpressTrak pursuant to a clause contained in the Operating Agreement. Upon consideration of the parties' submissions and for the reasons set forth below, the Court will order that this case be referred to arbitration and will require that Amtrak maintain its business operations with ExpressTrak pending a decision by the designated arbitrator.

## I. *Factual Background*

ExpressTrak was purportedly established "for the exclusive purpose of entering into a joint venture with Amtrak to provide express (non-passenger) services in conjunction with Amtrak's passenger service." Petition to Compel Arbitration and for an Injunction Pending Arbitration ("Pet. for Arb.") at 2. On October 27, 1999, after approximately three years of negotiations, the parties executed the Operating Agreement that provides "for the transportation of perishable goods (fruits, vegetables, meat, cheese, and other food products) in temperature-controlled rail cars ("Express Cars"), which were to be attached to Amtrak's inter-city passenger trains." *Id.* at 2–3. Under this Operating Agreement, which envisioned the use of up to 350 Express Cars, ExpressTrak committed to acquiring railcar "hulks" that would be refurbished to Amtrak's standards in order to convert them into Express Cars. *Id.* at 3–4. Amtrak states that the Operating Agreement "contemplated that ExpressTrak would cause the refurbished railcars to be conveyed to a third-party lessor[, who] . . . would in turn lease the [Express] Cars to Amtrak, and Amtrak would [then] sublease the [Express] Cars to ExpressTrak." Complaint for Declaratory Relief and for Damages, and Request for Speedy Hearing ("Compl.") at 3. Pursuant to this arrangement, "Amtrak would make the lease payments to the third-party lessor and ExpressTrak would simultaneously pay an equal amount to Amtrak." *Id.*

After the Operating Agreement was executed, Amtrak secured financing from ORIX Financial Services, Inc. ("Orix") for 110 railcars. *Id.* On May 15, 2001, Orix and Amtrak executed a document entitled "Lease of Railroad Equipment (Amtrak Lease No. 01–A)" ("Headlease"), which required Orix to provide funding to Amtrak for the purchase of the 110 railcars. *Id.* On this same date, Amtrak and ExpressTrak executed a document entitled "Sublease of Railroad Equipment (Amtrak Sublease No. 01–AS)" ("Sublease"), which provided that Amtrak would lease the 110 railcars to ExpressTrak. *Id.* A total of 55 railcars were subsequently delivered to ExpressTrak. *Id.* However, on November 16, 2001, Orix apparently refused to finance the remaining 55 railcars. *Id.* at 5. In response to this occurrence, Amtrak and ExpessTrak signed an additional agreement ("Direct Lease") on November 30, 2001, which provided for Amtrak to purchase the railcars directly from the refurbishing vendor and then lease them to ExpressTrak. *Id.* The Direct Lease provides that "Amtrak and ExpressTrak shall have substantially the same rights and obligations with respect to the railcars subject to the Sublease." Pet. for Arb., Exhibit ("Ex.") 5 at 1.[1]

During the course of the contractual arrangement set forth above, the parties each contend that the other breached a contractual obligation. Amtrak asserts that ExpressTrak defaulted under the terms of the leases when it failed to make timely lease payments on two separate occasions. Compl. at 5–6. ExpressTrak, on the other hand, asserts that Amtrak has been in default since the Operating Agreement was originally executed by failing, among other things, to secure the financing for the acquisition of the additional 240 Express Cars envisioned by the Operating Agreement and the necessary facilities and "slots" for its railcars. Pet. for Arb. at 6. These underlying disputes, however, are not before the Court at this time, as this

---

1. Thus, because the parties have the "same rights and obligations" under both the Sublease and the ·Direct Lease, the Court needs not distinguish between the two in resolving the disputes at hand.

Court must first decide whether these disputes must be resolved in an arbitral forum, rather than in this Court. At the heart of the issue of whether the parties disputes must be arbitrated, and, if so, whether an injunction should be issued pending a resolution, is the parties' Operating Agreement.

### (A) *The Operating Agreement*

The Operating Agreement sets forth the parties' relationship regarding their "wish to commence temperature controlled perishable service using equipment that ExpressTrak will acquire and refurbish in accordance with Amtrak plans and specifications, operating in train slots committed to ExpressTrak by Amtrak on its intercity passenger trains." Pet. for Arb., Ex. 1 (Operating Agreement) at 1. Particularly important to the issues before this Court is Section 6.6 ("Disputes") of the Operating Agreement, which specifies the manner by which the parties are required to resolve any disputes. Section 6.6(a) provides:

> *Controversies Subject to Arbitration.* Any claim or controversy between ExpressTrak and Amtrak which cannot be resolved by the parties concerning the interpretation, application, or implementation of this agreement shall be resolved by submitting it to arbitration pursuant to the provisions of this section.

*Id.*, Ex. 1 at 26. Section 6.6 also includes provisions regarding the arbitration procedure, the costs of arbitration, and the enforcement of an arbitrator's award. Finally, and once again particularly pertinent to the issues before this Court, is Section 6.6(e) which provides:

> *Pending Resolution.* Except as provided specifically in other sections of this Agreement, while such arbitration proceeding is pending, the business, the operations to be conducted, physical plant to be used, and compensation for services under this Agreement, to the

extent that they are the subject of such controversy, shall continue to be transacted, used, and paid in the manner and form existing prior to the arising of such controversy, unless the arbitrators shall make a preliminary ruling to the contrary.

*Id.*, Ex. 1 at 28. While the Operating Agreement memorialized the parties' contractual relationship regarding the Express Cars, the Operating Agreement clearly envisioned the execution of subsequent agreements between Amtrak, ExpressTrak, and third-party lessors, related to the specifics concerning the leasing of the Express Cars. Section 1.8 ("Ownership and Payment for Express Cars") of the Operating Agreement provides that:

> If the prototype Express Car(s) meets the test standards . . . and [if the cost of the Express Cars meets certain criteria] . . . ExpressTrak shall procure the Express Cars for the expanded fleet program. *Subject to the execution of a lease between Amtrak and third party lessor, the terms of which shall be approved by ExpressTrak, ExpressTrak will cause the Express Cars to be conveyed to the third party lessor, who will lease the Express Cars to Amtrak, and Amtrak will sublease them to ExpressTrak.* The prototype cars shall be purchased by the third party lessor at ExpressTrak's costs in acquiring and refurbishing them . . . and included in the lease and sublease. ExpressTrak shall make monthly payments to Amtrak equal to the amount of Amtrak's monthly lease payments to the third party . . .

*Id.*, Ex. 1 at 6–7 (emphasis added). And, as discussed above, Section 1.8 of the Operating Agreement was implemented when Orix and Amtrak executed the Headlease, and then, in turn, Amtrak and ExpressTrak executed the Sublease.

**(B)** *The Sublease*

As envisioned by the Operating Agreement, the Sublease sets forth, in detail, the specifics of the lease agreement for the acquisition of the Express Cars. Throughout the Sublease there are numerous references to the Operating Agreement, as the Sublease incorporates Operative Documents, which it defines "collectively [as] the Headlease, this Lease, any Lease Supplement, the Purchase Agreement Assignment and the Operating Agreement." *Id.,* Ex. 4 at 5. Specifically, Section 21.2 of the Sublease states:

> *Effect and Modification of this Lease.* Except for the other Operative Documents, this Lease exclusively and completely states the rights of the Lessor and Lessee with respect to the leasing of the Units and supercedes all other agreements, oral or written, with respect thereto . . .

*Id.,* Ex. 4 at 29. The Sublease also contains Section 30 ("Jury Trial Waiver and Jurisdiction"), which Amtrak places much emphasis on as support for its position that the current disputes between the parties are properly before this Court. Section 30 states:

> LESSOR AND LESSEE EACH WAIVE ALL RIGHTS TO A TRIAL BY JURY IN THE EVENT OF ANY LITIGATION WITH RESPECT TO ANY MATTER RELATED TO THIS LEASE OR THE OPERATIVE DOCUMENTS, AND LESSOR AND LESSEE EACH IRREVOCABLY CONSENT TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA AND IN THE EVENT SUCH FEDERAL COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION THE COURTS OF THE DISTRICT OF COLUMBIA IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LEASE OR THE OPERATIVE DOCUMENTS.

*Id.,* Ex. 4 at 41 (emphasis in the original).

## II. *Legal Analysis*

**(A)** *Do the Parties Disputes Have to be Arbitrated?*

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 (2000), was originally enacted in 1925 to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *see EEOC v. Waffle House, Inc.,* 534 U.S. 279, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002); *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 111, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001); *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 270–71, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). "[W]hen Congress passed the Arbitration Act in 1925, it was 'motivated, first and foremost, by a . . . desire' to change this antiarbitration rule." *Allied–Bruce,* 513 U.S. at 270–71, 115 S.Ct. 834 (quoting *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 220, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)). Those courts that have examined arbitration agreements recognize that individuals who agree to arbitrate their claims do not forgo their "substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)); *see Nelson v. Insignia/Esg, Inc.,* 215 F.Supp.2d 143 (D.D.C.2002) (Walton, J.). Furthermore, federal courts have recognized a strong public policy favoring arbi-

tration and "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The Supreme Court has stated that

> where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (internal quotation and citation omitted). Nonetheless, the Court is reminded that the "first principle of arbitrability ... is that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *National Railroad Passenger Corp. v. Boston and Maine Corp.*, 850 F.2d 756, 759 (D.C.Cir.1988) (quoting *AT & T Technologies*, 475 U.S. at 648, 106 S.Ct. 1415).

### (1) *Is the Arbitration Clause Broad or Narrow?*

██ Courts, when undertaking an effort to determine whether a particular dispute is within the scope of an arbitration clause, generally begin the inquiry by analyzing whether the arbitration clause itself is broad or narrow because the classification of the clause dictates the breadth of its coverage. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir.2001) (citations omitted). Those arbitration clauses that are considered "broad" in nature "are not limited to claims that literally arise under the contract, but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Pennzoil Exploration and Production Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir.1998) (citing *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir.1988); *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir.1998)). Other courts have described the breadth of broad arbitration clauses to reach disputes that "touch matters" within the agreement containing the arbitration clause. *See, e.g., Mitsubishi Motors*, 473 U.S. at 625 n. 13, 105 S.Ct. 3346; *Louis Dreyfus*, 252 F.3d at 224–25. On the other hand, matters that are collateral to the agreement containing the arbitration clause will generally be beyond the purview of a "narrow" arbitration clause. *Louis Dreyfus*, 252 F.3d at 224.

In this case, the parties' arbitration clause provides that "[a]ny claim or controversy between ExpressTrak and Amtrak which cannot be resolved by the parties concerning the interpretation, application, or implementation of this agreement shall be resolved by submitting it to arbitration pursuant to the provisions of this section." Pet. for Arb., Ex. 1 at 26. The District of Columbia Circuit, in *National Railroad Passenger Corp. v. Consolidated Rail Corp.*, 892 F.2d 1066, 1068 (D.C.Cir.1990) and *National Railroad Passenger Corp. v. Boston and Maine Corp.*, 850 F.2d at 758, was asked to interpret arbitration clauses that also involved Amtrak as one of the contracting parties and read identical to the arbitration clause in this case by requiring that "any claim or controversy between [the parties] concerning the interpretation, application or implementation of this Agreement shall be submitted to binding arbitration ..." This Court finds the *Consolidated Rail* and *Boston and Maine* cases particularly instructive on the scope of the parties' arbitration clause. In that regard, it is noteworthy that in both cases

the Circuit Court deemed the clauses to be "broad" in scope. *Consolidated Rail*, 892 F.2d at 1068 ("[t]he arbitration clause ... is a broad one"); *Boston and Maine*, 850 F.2d at 760 (the agreement contained a "broad arbitration clause"). Faced with the prospect that the Court would construe the arbitration clause in this case as broad, Amtrak seeks to distinguish the *Consolidated Rail* and *Boston and Maine* cases by asserting that the cases are inapposite because the disputes there did not arise from a separate agreement, as is purportedly the situation in this case since Amtrak asserts that the disputes arose under the Sublease and not the Operating Agreement, which contains the arbitration clause. For the reasons set forth below, this Court sees no reason to reach a resolution at odds with the conclusion of the Circuit Court that the scope of the arbitration clause here is also "broad".

(2) *Is this Arbitration Clause Broad Enough to Cover Separate Agreements Executed in Furtherance of the Original Agreement Containing the Arbitration Clause?*

■ This Court is confronted with the question of whether an arbitration clause, which has been construed as "broad" by the District of Columbia Circuit, is expansive enough to cover disputes that arise in connection with subsequent agreements that were executed in furtherance of the original agreement containing the arbitration clause. While it appears that the District of Columbia Circuit has not addressed this precise issue, other circuits have. Particularly instructive on this issue is the Fifth Circuit's recent opinion in *Personal Security & Safety Systems Inc. v. Motorola Inc.*, 297 F.3d 388 (5th Cir.2002). The dispute there arose from the defendant's, Motorola Inc. ("Motorola"), agreement to purchase the plaintiff's, Personal Security & Safety Systems Inc. ("PSSI"), stock and the contemporaneous execution of three other agreements: a Stock Purchase Agreement, a Product Development and License Agreement, and a Shareholders Agreement. *Id.* at 390. Subsequently, PSSI requested that Motorola provide it with financing to install a security system it had developed at several of its customers' sites pursuant to their Stock Purchase Agreement. *Id.* at 391. When Motorola refused to provide the necessary financing, PSSI brought suit and Motorola invoked the arbitration provision contained in the Product Development Agreement. *Id.* Thus, the Fifth Circuit was confronted with deciding whether the arbitration provision in the Product Development Agreement was broad enough to apply to PSSI's claims it was making pursuant to the Stock Purchase Agreement. The Fifth Circuit began its analysis by looking first to the language of the arbitration clause which provided that "the parties hereby agree to resolve by binding arbitration any and all claims ... arising out of or relating to this Agreement ..." *Id.* at 392. The *Personal Security* Court, citing to its earlier decision in *Pennzoil Exploration*, stated that when

> an arbitration provision purports to cover all disputes 'related to' or 'connected with' the agreement, we have held that the provision is not limited to claims that literally arise under the contract, but rather embrace[s] all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute.

*Personal Security*, 297 F.3d 388 (quoting *Pennzoil Exploration*, 139 F.3d at 1067) (internal quotations omitted). Utilizing a similar argument advanced by Amtrak in this case, PSSI argued that the arbitration clause was contained in an "ancillary agreement" and thus was "not intended to govern the parties' entire relationship." *Id.* at 393–94. The *Personal Security* Court rejected this position, stating that

even if "the Stock Purchase Agreement[, which did not contain the arbitration clause,] is the heart of the transaction at issue here, ... this fact is not dispositive because the arbitration provision is contained in an agreement that was essential to the overall transaction." *Id.* at 394. Thus, the Fifth Circuit concluded that "where the parties include a broad arbitration provision in an agreement that is 'essential' to the overall transaction, we will presume that they intended the clause to reach all aspects of the transaction—including those aspects governed by other contemporaneously executed agreements that are part of the same transaction." *Id.* at 394–95.

The Fourth Circuit, in *Drews Distributing, Inc. v. Silicon Gaming, Inc.,* 245 F.3d 347 (4th Cir.2001), was also faced with deciding whether an arbitration clause contained in an agreement covered a dispute that arose under a separate agreement not containing an arbitration provision. Drews Distributing, Inc. ("Drews") and Silicon Gaming, Inc. ("SGI") had entered into an agreement for Drews to purchase and distribute video gambling machines manufactured by SGI. Approximately nine months later the parties signed a Letter Agreement that set forth the terms of the sale of an initial shipment of gaming machines, including the fact that they would subsequently enter into an exclusive distributor agreement. *Id.* at 348. Several weeks later the parties entered into the contemplated Distributor Agreement, which set forth the terms governing the parties' "commercial dealings" and contained an arbitration provision. *Id.* at 349. Asserting a similar argument as Amtrak does in this case, Drews argued that the dispute arose from the Letter Agreement and not the Distributor Agreement containing the arbitration provision. *Id.* at 350. Beginning its analysis by determining that the arbitration clause was a "broad one", as it covered "any controver-

sy or claim arising out of or related to that agreement", the Fourth Circuit found it "immaterial that the present dispute grew out of the Letter Agreement, which contains no arbitration clause, if the dispute also 'relates to' the Distributor Agreement[,]" which contained the "broad" arbitration provision. *Id.* at 349–50 (citing *Kvaerner ASA v. Bank of Tokyo–Mitsubishi, Ltd.,* 210 F.3d 262, 265 (4th Cir.2000) ("dispute growing out of contract with no arbitration clause, but which stated parties had 'rights and remedies' under another contract with such a clause, is arbitrable.")). In reaching this conclusion, the *Drews Distributing* Court did not find Drew's argument persuasive because "the reach of an arbitration clause is not restricted to those causes of action brought under the contract containing the clause, unless the parties draft a clause so restricted in scope." *Id.* (citing *J.J. Ryan,* 863 F.2d at 319). Thus, the Fourth Circuit held that if a dispute arises under an agreement that "relates to" another agreement that contains a "broad" arbitration provision, then the dispute must be arbitrated.

In this case, the Court is confronted with the initial Operating Agreement that delineated in great detail the contractual relationship between Amtrak and ExpressTrak for the lease of Express Cars. As indicated above, the Operating Agreement contains an arbitration clause which provides that "[a]ny claim or controversy between ExpressTrak and Amtrak which cannot be resolved by the parties concerning the interpretation, application, or implementation of this agreement shall be resolved by submitting it to arbitration ..." Pet. for Arb., Ex. 1 at 26. Like the identical arbitration agreements in *Consolidated Rail* and *Boston and Maine,* which the Circuit Court construed as "broad", the arbitration agreement here must be afforded the same status.

The Operating Agreement clearly contemplated that a subsequent lease agreement would be executed between the parties to fulfill the objectives of the Operating Agreement. It appears that the parties intended for the Operating Agreement to set forth the general contractual relationship between them for the lease of the Express Cars and that all other agreements they executed, including the Sublease, were intended to provide the substance necessary for the implementation of the Operating Agreement. This is plainly evident in Section 1.8 of the Operating Agreement, which discusses the acquisition of and payment for the Express Cars, providing that "[s]ubject to the execution of a lease between Amtrak and a third party lessor ... ExpressTrak will cause the Express Cars [it procures] to be conveyed to the third party lessor, who will lease the Express Cars to Amtrak, and Amtrak will sublease them to ExpressTrak." Pet. for Arb., Ex. 1 at 6–7. And this is what occurred when the Headlease and the Sublease were subsequently executed. Thus, the "implementation" of the Operating Agreement is embodied in the lease agreements. Moreover, the inter-relationship between the Operating Agreement and the Sublease is reflected in Section 21.2 of the Sublease, which discusses the effect of the Sublease on the parties' contractual relationship. Pet. for Arb., Ex. 4 at 29. Section 21.2 states that "[e]xcept for the other Operative Documents, [which includes the Operating Agreement,] this Lease exclusively and completely states the rights of Lessor and Lessee with respect to the leasing of the Units ..." *Id.* Accordingly, it is clear that the Sublease is an agreement that was executed to implement the parties' lessor-lessee relationship established in the Operating Agreement.

Finally, this Court finds it noteworthy that although Amtrak claims that the Operating Agreement's arbitration clause is "narrow" and should only apply to disputes that directly deal with the implementation of the Operating Agreement, this position actually supports ExpressTrak's argument because the dispute raised by Amtrak in its lawsuit is, in fact, directly traceable to the Operating Agreement itself. This conclusion is called for because the breach being alleged by Amtrak in its complaint is the failure of ExpressTrak to make two timely monthly lease payments. Section 1.8 of the Operating Agreement, which was discussed above for its language that related to the execution of a lease between the parties, also states that "ExpressTrak shall make monthly payments to Amtrak equal to the amount of Amtrak's monthly lease payments to the third party ..." Pet. for Arb., Ex. 1 at 7. Thus, because the implementation of the Operating Agreement, by its own terms, necessitated the creation of the Sublease, which further specifies the contractual relationship between the parties, the two agreements have a direct relationship to each other and the failure to timely make lease payments as required by the Sublease is encompassed by the arbitration clause in the Operating Agreement, unless the parties otherwise agreed to limit the scope of the arbitration provision.

(3) *What is the Relationship Between the Arbitration Clause in the Operating Agreement and Dispute Resolution Clauses in the Sublease?*

■ Finding that the Operating Agreement's arbitration clause is sufficiently "broad" to cover a lease dispute arising from the Sublease, the Court must next turn to Amtrak's argument that dispute resolution clauses contained in the Sublease preclude arbitration of any lease related disputes. As fully set forth above, Section 30 of the Sublease contains a dis-

pute resolution clause in which the parties waive any rights to a jury trial "in the event of any litigation with respect to any matter related to th[e] lease or the operative documents" and consent to the jurisdiction of this Court "in connection with any action or proceeding arising out of or relating to this lease or the operative documents." Pet. for Arb., Ex. 4 at 41 (language in all uppercase letters in the original). In addition, in the event of a default, Section 13.2 of the Sublease states that Amtrak has the discretion to exercise several rights listed in that section "subject to compliance with any mandatory requirements of, applicable law then in effect." Pet. for Arb., Ex. 4 at 21. One of these rights, Amtrak notes, includes its ability to "proceed by appropriate court action or actions, either at law or in equity, to enforce performance by [ExpressTrak] of the applicable covenants of this Lease or to recover damages for the breach thereof ..." Pet. for Arb., Ex. 4 at 22. Thus, Amtrak asserts that these two provisions preclude arbitration of disputes arising under the Sublease.

For assistance in resolving this issue, the Court will once again turn to other circuits that have addressed similar circumstances. Returning to the Fifth Circuit's opinion in *Personal Security,* that court, in addition to addressing the breadth of the Product Development Agreement's arbitration provision to disputes arising under the Stock Purchase Agreement, was also faced with a dispute resolution clause in the Stock Purchase Agreement that arguably was in conflict with the arbitration clause contained in the Product Development Agreement. 297 F.3d at 395–96. In addition to the "broad" arbitration clause in the Product Development Agreement, the Stock Purchase Agreement contained a provision that read: "*Governing Law.* This agreement shall be governed by and construed in accordance with the laws of the State of Texas. Any suit or proceeding brought hereunder shall be subject to the exclusive jurisdiction of the courts located in Texas." *Id.* at 395 (language in all uppercase letters in the original). PSSI, in an argument similar to the one advocated by Amtrak in this case, asserted that this forum selection provision "intended to confer solely upon Texas courts the power to decide any dispute brought under the Stock Purchase Agreement." *Id.* (internal quotation omitted). The Fifth Circuit stated that

[s]tanding alone, one could plausibly read the forum selection clause to mean that Texas courts have the exclusive power to resolve all disputes arising under the Stock Purchase Agreement. But the forum selection clause does not stand alone. To the contrary, we must interpret the forum selection clause in the context of the entire contractual arrangement and we must give effect to all of the terms of that arrangement.

*Id.* Reading the forum selection and arbitration provisions together, the *Personal Security* Court "interpret[ed] the forum selection clause to mean that the parties must litigate in Texas courts only those disputes that are not subject to arbitration—for example, a suit to challenge the validity or application of the arbitration clause or an action to enforce an arbitration award." The Fifth Circuit noted that its conclusion, that the forum selection clause was designed to apply to non-arbitrable disputes, was derived not only from reading the two provisions in conjunction with each other, but also from the proposition that "a forum selection clause cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration." *Id.* at 396 n. 11 (citing *Patten Securities Corp., Inc. v. Diamond Greyhound & Genetics, Inc.,* 819 F.2d 400, 407 (3d Cir.1987), *abrogated on other grounds by Gulfstream Aerospace Corp. v.*

*Mayacamas Corp.*, 485 U.S. 271, 287, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988); *In re Winter Park Const., Inc.*, 30 S.W.3d 576, 578 (Tex.App.-Texarkana 2000)).

The Third Circuit in *Patten Securities* began its analysis of the inter-relationship between arbitration and forum selection clauses by reiterating the familiar pronouncement by the Supreme Court that "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or like defense to arbitrability." 819 F.2d at 407 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25, 103 S.Ct. 927). Noting that forum selection clauses do not enjoy such "federal favor", the *Patten Securities* Court stated that "the forum selection clause must be scrutinized carefully, and if doubts arise as to whether this dispute is arbitrable or not, such doubts must be resolved in favor of arbitrability." *Id.* Of particular significance, is the Third Circuit's observation that the forum selection clause contained no mention of the arbitration provision and that if arbitration was to be precluded, then the parties could have specifically indicated that in the subsequent dispute resolution clause. *Id.*

In this case, when examining the dispute resolution clauses contained in the Sublease in isolation, it would appear that a judicial remedy was envisioned for any disputes arising from the Sublease. But, an analysis of the impact of these clauses would be deficient without considering, as this Court must, the pre-existing arbitration clause contained in the Operating Agreement. *See Personal Security*, 297 F.3d at 395 (interpreting forum selection clause in context of entire contractual relationship and finding that arbitration clause applied) (citing *Richland Plantation Co. v. Justiss–Mears Oil Co., Inc.*, 671 F.2d 154,

156 (5th Cir.1982) ("When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, reconciling apparently conflicting provisions and attempting to give effect to all of them, if possible.")); *Patten Securities*, 819 F.2d at 407 (same). When considering the Operating Agreement's arbitration clause and the Sublease's dispute resolution clauses together, this Court finds that the proper interpretation is that the subsequently executed dispute resolution clauses contained in the Sublease apply only to those issues that are non-arbitrable. *See Personal Security*, 297 F.3d at 395; *Patten Securities*, 819 F.2d at 407. If Amtrak had actually intended to make litigation in this Court the exclusive means for resolving disputes arising out of their Sublease agreement, it could have done so by specifically indicating the preclusion from arbitration of any disputes arising out of the leases. And while counsel for Amtrak at a hearing on this matter asserted that the Sublease's dispute resolution clauses came as close as possible to obviating the Operating Agreement's arbitration clause without specifically stating so, in the end, Amtrak cannot escape the fact that it failed to specifically do so. Thus, while there may appear to be some ambiguity when considering the arbitration clause and the dispute resolution provisions together, in light of the FAA's preference for arbitration, this Court must construe such ambiguity in favor of arbitration. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25, 103 S.Ct. 927. This outcome is in keeping with what other courts have done in this Circuit when considering multiple agreements with conflicting provisions executed pursuant to a contractual relationship. *See, e.g., Trans Bay Engineers and Builders, Inc. v. Hills*, 551 F.2d 370, 379 (D.C.Cir.1976) ("Where two or more written agreements are contemporaneously executed as part of one complete

package, they should be construed together and should be construed as consistent with each other ..."); *Friedman v. Manfuso,* 620 F.Supp. 109, 117 (D.D.C.1985) ("Where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other.") (citations omitted). Accordingly, this Court concludes that the lease agreement dispute being advanced by Amtrak in this lawsuit must be submitted to arbitration.

**(B)** *Should a Preliminary Injunction be Issued Pending Arbitration?*

■ Having found that arbitration of the lease disputes is required by the Operating Agreement's arbitration provision, the Court is now faced with addressing a separate issue as to whether a preliminary injunction should be issued so that the parties' will have to maintain their contractual relationship pending resolution of their disputes by the arbiter.[2] Resolution of this issue would be much more difficult in the absence of the status quo provision contained in the Operating Agreement. This is because unanimity by the courts is lacking on whether a preliminary injunction is generally appropriate when arbitration is compelled by a court. *Compare Teradyne, Inc. v. Mostek Corp.,* 797 F.2d 43, 47 (1st Cir.1986); *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124 (2d Cir.1984); *Ortho Pharmaceutical Corp. v. Amgen, Inc.,* 882 F.2d 806, 811–15 (3d Cir.1989); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048 (4th Cir.1985); *Sauer–Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984) (all holding that preliminary injunctive relief available), *with*

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey,* 726 F.2d 1286, 1291 (8th Cir.1984) (holding that preliminary injunctive relief is inappropriate). This Court, however, does not have to resolve this more difficult question because when the Operating Agreement in this case was executed, a form of injunctive relief was clearly contemplated pending the submission of a dispute to the arbitration process.

In *RGI, Inc. v. Tucker & Associates, Inc.,* 858 F.2d 227 (5th Cir.1988), the Fifth Circuit was confronted with a similar situation as is presented in this case, that is, the inclusion in a contract of both an arbitration provision and a status quo provision. Noting the general disagreement among some of the circuits on whether a preliminary injunction is appropriate when a court compels arbitration, the *RGI* Court stated that it "need not resolve the differences between these views ... in order to decide this appeal; for there is an area of consensus." *Id.* at 230. This was because the contract at issue in that case contained a status quo provision stating that "[i]n the event that a dispute is submitted for arbitration pursuant to this paragraph, this Subcontract shall continue in full force and effect until such decision is rendered ..." *Id.* The Fifth Circuit explained that even in *Hovey,* where the Eighth Circuit declined to grant injunctive relief, the court nonetheless recognized that the issuance of a preliminary injunction may be appropriate when a contract contemplates injunctive relief. *Id.* (citing *Hovey,* 726 F.2d at 1291, which distinguished the circumstances before it from those situations where courts have found preliminary injunctive relief appropriate because "[i]n contrast, in our case we do not have ... a contract provision" that contemplates injunctive relief to maintain the status quo).

**2.** The need to address this issue is compelled in light of Amtrak's clearly stated position

that it will cease operating the Express Car service on December 6, 2002.

Thus, the *RGI* Court concluded that "it was appropriate for the district court to issue the preliminary injunction to insure that the arbitration clause of the contract will be carried out as written ... [b]ecause the ... decision to issue the preliminary injuction falls in an area of apparent consensus among the Circuits as to preliminary injunctions under the Federal Arbitration Act ..." *Id.*

Similarly, the Second Circuit in *Guinness Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468 (2d Cir.1980), also required specific performance of the parties' contractual relationship when the contract at issue contained both an arbitration clause and a status quo provision. The *Guinness–Harp* Court stated that because the FAA required the enforcement of arbitration agreements, a status quo provision in that same contract "can be considered part of the obligation to arbitrate." *Id.* at 472. The Second Circuit went on to state that "Guinness did not simply agree to arbitration in general; it agreed to arbitration that was to take place before the status quo between the parties had been altered." *Id.* Thus, the court found that because "maintenance of the status quo pending arbitration relates in a substantial way to the performance of the agreement[,] Guinness is therefore entitled to specific performance of its arbitration agreement, including the status quo provision." *Id.*

Finally, even in the Eighth Circuit, where the *Hovey* decision was rendered, it is recognized that "the bargained-for terms of the Agreement requir[ing] continued performance as part of the dispute resolution process" will require that a preliminary injunction be issued. Accordingly, in *Peabody Coalsales Co. v. Tampa Electric Co.*, 36 F.3d 46 (8th Cir.1994), the Eighth Circuit stated that when arbitration is compelled pursuant to the FAA, the statute "requires the court to 'make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.'" *Id.* at 48 (quoting 9 U.S.C. § 4). Thus, the *Peabody Coalsales* Court found that "an order compelling arbitration 'in accordance with the terms of the agreement' must necessarily include an order requiring continued performance." *Id.*

In this case, Section 6.6(e) of the Operating Agreement, states, in part, that

> while such arbitration proceeding is pending, the business, the operations to be conducted, physical plant to be used, and compensation for services under this Agreement ... shall continue to be transacted, used, and paid in the manner and form existing prior to the arising of such controversy, unless the arbitrators shall make a preliminary ruling to the contrary.

Pet. for Arb., Ex. 1 at 28. It is clear from this language that when the parties executed the Operating Agreement, which contains the arbitration clause, they must have contemplated that a court would step in and issue a preliminary injunction pending the resolution of arbitration if a party to the agreement sought to alter the status quo before the arbitration process commenced. To allow Amtrak to unilaterally terminate its contractual obligations in violation of what the parties agreed to in Section 6.6(e) would have the practical effect of rendering the arbitration provision meaningless. *See Teradyne*, 797 F.2d at 51 ("the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, ipso facto, the meaningfulness of the arbitration process.").

While Amtrak asserts that this Court must undertake an analysis of the traditional four factors in assessing whether to

grant a preliminary injunction, this Court finds such an analysis unnecessary. This is because the Court is simply ordering the specific performance of the status quo provision of a contract the parties agreed to. That is what the parties bargained for, and that is what the parties are obligated to do. *See RGI,* 858 F.2d at 230 ("the court need not involve itself in balancing the various factors to determine whether a preliminary injunction should be issued.") (citing *Mississippi Power & Light v. United Gas Pipe Line,* 760 F.2d 618, 621 (5th Cir.1985)). If under such circumstances a court is required to conduct the traditional analysis before granting injunctive relief, it would necessitate a consideration of the underlying merits of the case. *See, e.g., Al–Fayed v. CIA,* 254 F.3d 300, 303 (D.C.Cir.2001) (preliminary injunction analysis requires court to decide whether "the plaintiff has a substantial likelihood of success on the merits"). But, having concluded that the parties must submit their disputes to arbitration, and to then engage in the traditional preliminary injunction analysis, would inappropriately invade the province of the aribtral forum as a result of the Court's evaluation of the merits of the parties' substantive disputes. Therefore, without conducting the traditional four-part analysis, this Court will enjoin Amtrak from altering the status quo "while [the] arbitration proceeding is pending ... unless the arbitrators shall make a preliminary ruling to the contrary[ ]", as is required by Section 6.6(e) of the Operating Agreement.[3]

3. The Court notes that while Amtrak has asserted the significant monetary loss it will allegedly suffer should this case be referred to arbitration if the status quo has to be maintained pending that process, Section 6.6(e) contains a provision allowing the "arbitrators [to] make a preliminary ruling" that the parties' continued contractual relationship need

### III. *Conclusion*

For the stated reasons, this Court will compel the parties to submit their disputes to arbitration. Furthermore, in keeping with the parties' agreement, the Court will also order a preliminary injunction requiring the maintenance of the status quo of the parties' contractual relationship as called for by Section 6.6(e) of the Operating Agreement. Finally, in sending these disputes to arbitration, the Court urges the arbitrators to make an initial determination as expeditiously as possible about whether to maintain the status quo pending the final arbitral resolution of the parties' disputes.[4]

not continue pending a final resolution in arbitration. Thus, Amtrak must look to the arbitrators for immediate relief, and not this Court.

4. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.