# United States Court of Appeals

## For the First Circuit

No. 05-1016

PUERTO RICO PORTS AUTHORITY,

Petitioner, Appellant,

v.

BARGE KATY-B, O.N. 606665,

Defendant in Rem.

_____

SALMON BAY BARGE LINE, INC.,

Intervenor, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Selya and Lynch, Circuit Judges,

and Restani,** Judge.

Lawrence I. Kiern, with whom H. Allen Black III, Gerald A. Morrissey III, Winston & Strawn LLP, Jorge A. Fernández-Reboredo, Luis O. Soto-Colón, and Rivera & Fernández-Reboredo, P.S.C. were on brief, for appellant.

Christopher A. Abel, with whom Troutman Sanders LLP, Eugene F. Hestres-Velez, and Bird, Bird & Hestres were on brief, for appellee.

October 25, 2005

_____

*Chief Judge of the United States Court of International Trade, sitting by designation.

**SELYA**, **Circuit Judge**.  In this interlocutory appeal, which raises salient questions of both appellate jurisdiction and admiralty law, the Puerto Rico Ports Authority (PRPA) seeks to stem a tide of unfavorable rulings emanating from the district court. After careful consideration, we affirm the district court's order vacating PRPA's arrest of a vessel but dismiss the remainder of PRPA's appeal for want of appellate jurisdiction.

## I.  BACKGROUND

For nearly four years, the barge KATY-B was moored at a pier operated by PRPA.  Pursuant to the terms of a lease with the barge's owner, San Antonio Maritime Corporation (SAM), PRPA assessed daily dockage charges against the barge.  SAM refused to pay these charges, citing its repeated complaints about PRPA's ostensible failure to provide suitable terminal facilities.

In June of 2003, PRPA initiated a summary eviction proceeding against SAM in a local court.  For whatever reason, PRPA did not include in its complaint a claim for the unpaid port charges.  SAM counterclaimed for damages associated with PRPA's alleged breach of the lease.  SAM also filed a complaint against PRPA with the Federal Maritime Commission.  See 46 U.S.C. app. § 1710(a).

In early 2005, PRPA told SAM that it preferred to have the barge removed from the pier before the onset of the hurricane season.  Although SAM wanted to accommodate PRPA's request by

-2-

selling the barge, there was a rub: PRPA's provision of services to the barge had given rise to an inchoate maritime lien enforceable against the barge even after a change in its ownership. See id. § 31342(a)(1); Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12 (1920). This lien right discouraged potential buyers since the fair market value of the barge was around $500,000 while the unpaid port charges exceeded $1,700,000. The barge's large negative equity greatly diminished the likelihood of a sale.

It was against this background that Victor González, SAM's president, and José Sarraga, SAM's attorney, met with Miguel Castellanos, PRPA's general counsel, and Edwin Rodríguez, chief of PRPA's maritime bureau. The avowed purpose of the meeting was to ascertain PRPA's intentions concerning enforcement of its maritime lien against the KATY-B. During this session, which took place in March of 2004, Sarraga requested that PRPA waive its lien in writing and agree to pursue the outstanding charges in the pending eviction proceeding. Castellanos clearly understood that a letter from PRPA disclaiming any objection to the sale of the barge and stating that the unpaid port charges were the subject of ongoing litigation would "facilitate or expedite" the barge's sale to a third party.

On March 23, 2004, Rodríguez sent a letter to González. The letter stated in pertinent part:

> In accordance with the recommendation of our General Legal Counsel, attorney Miguel Castellanos, the P.R. Ports Authority has no objection that your company sell the Barge . . ., and that the same sail out of the Bay of San Juan. Both parties are aware that [the unpaid port] charges are being controverted in the [court] case pending before the Superior Court of San Juan.
>
> We would appreciate that once the sale is finalized, that we be informed so we may discontinue the daily invoicing.

It is true that this epistle did not contain language expressly waiving the lien. It also is true that such express language is the customary method of waiving a lien. Nevertheless, Castellanos's testimony adequately evinces that PRPA understood the import of the letter:

> Q: You knew that the representations in this letter would be relied upon by whoever purchased the vessel, didn't you?
>
> A. Yes.
>
> Q. And you wanted whoever was going to purchase the vessel to know that they didn't need to worry about their liability, or the vessel[']s liability for the port charges because those charges were part of the court case in the Superior Court of San Juan, right?
>
> A. Right.

González and Sarraga construed the letter as a waiver of PRPA's maritime lien and an agreement that PRPA would prosecute its

claim for the unpaid port charges exclusively in the local courts. Relying on it, they represented to prospective purchasers that PRPA had waived its maritime lien and would not seek to arrest the KATY-B after a sale. In due course, SAM contracted with one such prospective purchaser, Salmon Bay Barge Line (S-Bay), for a sale of the barge. The purchase agreement recited that SAM and PRPA had agreed to resolve any dispute as to accrued port charges in the pending court proceedings and contained SAM's warranty that the vessel was free of maritime liens. The evidence is uncontradicted that S-Bay would not have entered into the purchase agreement but for the March 23 letter.

The sale of the barge closed on June 3, 2004. The following day, PRPA for the first time recorded its maritime lien against the KATY-B. PRPA maintains that it did not know about the sale of the barge when it prepared its notice of claim of lien. The fact that it recorded its lien within twenty-four hours after the closing was, in its words, a "mere coincidence." Nevertheless, PRPA acknowledges both that it knew of SAM's ongoing efforts to sell the barge and that it should have moved more celeritously to record its lien.

Later that month, PRPA initiated an in rem action against the KATY-B in the federal district court. The verified complaint prayed for the arrest of the barge and a money judgment against the barge in the amount of the accrued pre-sale port charges.

Following the barge's arrest on July 1, 2004, S-Bay intervened in the action and requested an expedited hearing on the propriety of the arrest. See Fed. R. Civ. P. Supp. R. E(4)(f).[1]

On July 12, 2004, PRPA served an amended complaint. The first count reiterated PRPA's prayer for in rem relief against the KATY-B with respect to the unpaid pre-sale port charges. The second count sought judgment against S-Bay for unpaid post-sale port charges.

Rodríguez, Castellanos, González, and Sarraga all testified at an evidentiary hearing held two days later. The parties also introduced a number of exhibits, including a copy of the March 23 letter from Rodríguez to González. The district court, ruling ore sponte, made the following findings: (i) that PRPA had an interest in the barge leaving San Juan prior to the hurricane season; (ii) that the March 23 letter was specifically intended to influence third parties who might be considering an acquisition of the barge; (iii) that as to such third parties, the letter constituted a waiver of PRPA's maritime lien against the

---

[1]Supplemental Rule E(4)(f) applies to in rem admiralty actions. It provides in pertinent part:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

KATY-B; (iv) that S-Bay came within the scope of the waiver since it purchased the barge in good faith and in reliance on the representations made by SAM regarding the state of the barge's title; (v) that SAM, in turn, had relied on PRPA's representations as set forth in the letter; and (vi) that the letter did not waive or otherwise diminish any of PRPA's underlying claims against SAM, including those that might be brought in the pending eviction proceeding, but only waived the right to enforce those claims through the medium of a maritime lien. Premised on these findings, the court vacated the writ of arrest. Relatedly, the court ruled that S-Bay did not owe PRPA any pre-sale port charges or any port charges for the period of the wrongful arrest. The court directed S-Bay to post a bond to cover port charges for the period between the date of the sale and the date of the arrest. Moreover, the court noted that S-Bay would be responsible to PRPA for any port charges incurred after the date of the hearing. The court also awarded attorneys' fees to S-Bay based on what it regarded as PRPA's bad faith conduct. Finally, the court retained jurisdiction over any continuing aspects of the controversy.

Subsequent to the entry of the district court's order, a series of events occurred. First, S-Bay and PRPA resolved the dispute relating to post-sale port charges, and the barge sailed out of San Juan. Second, S-Bay answered PRPA's amended complaint and asserted a counterclaim for damages arising out of the wrongful

arrest. Third, PRPA moved for reconsideration of key parts of the district court's order, arguing that the court had erred in quashing the arrest and that, in all events, PRPA had proceeded in the utmost good faith. Unmoved, the district court upheld its original order. PRPA v. Barge Katy-B, No. 04-1637 (D.P.R. Nov. 18, 2004) (unpublished).

This interlocutory appeal ensued. In it, PRPA asserts that the district court erred in two principal respects, namely, (i) in concluding that PRPA lacked a valid basis for arresting the KATY-B and (ii) in finding that PRPA prosecuted the arrest in bad faith. In the pages that follow, we address each of these assertions.

## II. THE WRIT OF ARREST

Before plunging into the validity of the vessel's arrest, we first address two threshold issues: whether this portion of PRPA's appeal is properly within our appellate jurisdiction and, if so, whether the fact that the barge has departed the territorial jurisdiction of the district court renders any portion of the appeal moot. Only after clearing these hurdles do we examine the merits of PRPA's plaint that the district court erred in vacating the arrest.

### A. Appellate Jurisdiction.

Inasmuch as the district court has not yet resolved all of the claims before it — S-Bay's counterclaim remains pending

-8-

below — the order appealed from is not a final order of the type reviewable by courts of appeals under 28 U.S.C. § 1291. See Catlin v. United States, 324 U.S. 229, 233 (1945) (holding that a final order "generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute judgment"). Consequently, unless some other valid grant of appellate jurisdiction pertains, this appeal is premature.

PRPA locates such a grant in 28 U.S.C. § 1292(a)(3), which authorizes federal appellate courts to hear appeals from "[i]nterlocutory decrees of . . . district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." An aggrieved party may take advantage of this special grant of appellate jurisdiction by showing (i) that the order appealed from is interlocutory and (ii) that it finally determines the rights and liabilities of the parties as to a discrete issue. Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel, 833 F.2d 1059, 1063 (1st Cir. 1987). For this purpose, determining the rights and liabilities of a party as to a discrete issue contemplates that the order in question affects substantive rights, not "merely procedural, tactical, or adjectival entitlements." Id. If the order "lashes down the merits of some particular claim or defense" advanced in the case in a way that implicates the parties' substantive rights, the statute applies.

Id. at 1064; see In re The S.S. Tropic Breeze, 456 F.2d 137, 139 (1st Cir. 1972) (holding that § 1292(a)(3) "applies to any decree finally determining the liability of one of the parties, even if it leaves open an issue which may . . . ultimately preclude recovery by a particular plaintiff"). The order appealed from in this case is plainly interlocutory, so we must train the lens of our inquiry on whether it finally determines the merits of a particular claim or defense.

Even before the 1926 enactment of section 1292(a)(3), the Supreme Court made it pellucid that appellate jurisdiction existed over an interlocutory order vacating a maritime arrest in an in rem case. Rejecting the argument that such an order was "not final" and therefore not immediately appealable, the Court reasoned:

> The suit is in rem—is against the ship. The decree holds for naught the process under which the ship was arrested, declares she is not subject to any such process and directs her release—in other words, dismisses her without delay. Thus the decree ends the suit as effectually as if it formally dismissed the libel. Obviously, therefore, it is final.

The Pesaro, 255 U.S. 216, 217-18 (1921). In our view, this doctrine of effective finality has been codified by (or, at least, survives) the enactment of section 1292(a)(3). See 29 James W. Moore et. al., Moore's Federal Practice ¶ 710.04[1] (3d ed. 1997). On that basis, then, interlocutory decrees vacating maritime arrests in in rem actions, such as the decree involved in this case, are immediately reviewable by the courts of appeals.

-10-

Even if the lines of The Pesaro were severed by the subsequent enactment of section 1292(a)(3) — and we do not think that is the case — PRPA still could fasten its appeal to the jurisdictional mooring of the statute. It is axiomatic that an in rem action against a vessel arises under the admiralty jurisdiction of the federal courts, see The Moses Taylor, 71 U.S. (4 Wall.) 411, 427 (1866), thus coming within the overall class of cases to which section 1292(a)(3) potentially applies. As said, the district court's order vacating the arrest of the KATY-B is interlocutory because it leaves unresolved part of the underlying action (S-Bay's counterclaim). See, e.g., Martha's Vineyard Scuba Headquarters, 833 F.2d at 1064 (holding an order interlocutory within the meaning of § 1292(a)(3) because it failed to address the parties' competing claims to salvage rights); cf. Nichols v. Cadle Co., 101 F.3d 1448, 1449 & n.1 (1st Cir. 1996) (per curiam) (classifying a grant of summary judgment as unappealable under § 1291 because certain counterclaims remained unresolved). And unlike an order refusing to vacate an arrest — which simply immobilizes the res pending a plenary trial on the merits of the in rem claims — an order vacating an arrest finally determines the rights and liabilities of the parties within the meaning of section 1292(a)(3). See Petroleos Mexicanos Refinacion v. M/T King A, 377 F.3d 329, 335-37 (3d Cir. 2004); Constructora Subacuatica Diavaz v. M/V Hiryu, 718 F.2d 690, 692 (5th Cir. 1983); cf. Swift & Co. Packers v. Compania

Colombiana Del Caribe, 339 U.S. 684, 688-89 (1950) (distinguishing between an order refusing to dissolve an attachment and an order dissolving an attachment, and finding only the latter reviewable by way of interlocutory appeal).

To sum up, the relevant portion of the district court's order resolved the merits of PRPA's in rem claim against the barge. No more is exigible to render that portion of the order both effectively final and appealable under section 1292(a)(3).

## B. **Territorial Jurisdiction**.

A second objection to our jurisdiction over this portion of PRPA's appeal is that the sailing of the KATY-B from Puerto Rico's territorial waters (and, thus, from the territorial jurisdiction of the district court) demolished any foundation for the continued exercise of in rem jurisdiction. This objection is meritless.

To state the obvious, the valid seizure of a res is a prerequisite to the initiation of an in rem action. Taylor v. Carryl, 61 U.S. (20 How.) 583, 599 (1858) (explaining that in admiralty cases the "seizure of the RES, and the publication of the monition or invitation to appear, is regarded as equivalent to the particular service of process in the courts of law and equity") (emphasis in original). It does not follow, however, that a court must have continuous possession of the res in order to maintain its in rem jurisdiction. Jurisdiction is perfected by the initial

-12-

seizure of the res and is generally not divested by the subsequent relinquishment of control over it. See Republic Nat'l Bank v. United States, 506 U.S. 80, 85 (1992); The Rio Grande, 90 U.S. (23 Wall.) 458, 463 (1875).

Of course, there are exceptions to this general rule. One such exception holds that jurisdiction is terminated when the res leaves the control of the court under circumstances in which a subsequent judgment would be devoid of "any effect whatsoever" and, therefore, "useless" to the prevailing party. Republic Nat'l Bank, 506 U.S. at 85 (citation omitted). That exception is inapposite here: although the KATY-B has sailed from San Juan, a judgment in PRPA's favor would not be useless because it could serve as a basis either for re-arresting the barge at any American port or for an in personam action against the barge's owner. See Bargecarib Inc. v. Offshore Supply Ships, Inc., 168 F.3d 227, 231 (5th Cir. 1999).

A second exception holds that jurisdiction lapses if and when the petitioner voluntarily abandons its quest at some point after effecting the initial seizure of the res but before instituting an in rem judicial proceeding. See Republic Nat'l Bank, 506 U.S. at 87 (discussing The Brig Ann, 13 U.S. (9 Cranch) 289 (1815)). Here, however, while an alleged waiver of PRPA's maritime lien is at issue, that alleged waiver did not take place in the interval between the arrest of the vessel and the institution of the in rem action. During that interval, PRPA

pursued the arrest diligently, without any hint of voluntary abandonment.

To say more on this point would be supererogatory. Because none of the exceptions to the general rule of continuing in rem jurisdiction applies here, the district court's jurisdiction over this action survives the sailing of the KATY-B from Puerto Rican waters. For the same reason, PRPA's appeal is not rendered moot by the departure of the KATY-B. See Gowen, Inc. v. F/V Quality One, 244 F.3d 64, 66 (1st Cir. 2001).

### C. **The Vacation of the Arrest**.

We now confront head-on PRPA's asseveration that the lower court erred in ordering the release of the KATY-B. PRPA attacks this portion of the order on two fronts. First, it avers that the court misconstrued the law and the evidence in concluding that PRPA had waived its lien for pre-sale port charges (and, thus, had waived any right to arrest the vessel on that account). Second, it argues that the post-sale port charges, which were not in any way affected by the March 23 letter, gave rise to an independent lien enforceable by an arrest of the barge — a lien that the district court simply ignored. We address these arguments in sequence.

**1. Pre-Sale Port Charges**. The Federal Maritime Lien Act, 46 U.S.C. app. §§ 31301-31343, governs the creation and waiver of maritime lien rights. A person who supplies "necessaries" to a

-14-

vessel automatically obtains a maritime lien against the vessel for the value of the goods or services supplied.  Id. § 31342(a)(1). A maritime lien for necessaries bears a right of enforcement through an in rem action against the encumbered vessel.  See id. § 31342(a); see also Fed. R. Civ. P. Supp. R. C (permitting an in rem action and attendant arrest to enforce any maritime lien).

A lienholder may, of course, choose to waive a lien for necessaries.  46 U.S.C. app. § 31305.  Such a waiver need not be express.  See W.A. Marshall & Co. v. S.S. "President Arthur", 279 U.S. 564, 568 (1929) (construing identical language in predecessor statute).  Nevertheless, the party seeking to establish a waiver must carry the heavy burden of showing that the lienholder took affirmative steps that made manifest a definite intention to forgo the lien and agreed to rely for payment solely on the creditworthiness of the vessel's owner.  Navieros Inter-Americanos v. M/V Vasilia Express, 120 F.3d 304, 323 (1st Cir. 1997); Farrell Ocean Servs., Inc. v. United States, 681 F.2d 91, 93-94 (1st Cir. 1982).  Because the statutory presumption in favor of maritime liens is a strong one, courts have been reluctant to find a waiver in the absence of a showing that the creditor deliberately intended to relinquish its lien rights.  See, e.g., Maritrend, Inc. v. Serac & Co. (Shipping) Ltd., 348 F.3d 469, 474 (5th Cir. 2003).

A determination that a creditor has waived a maritime lien is almost always deeply embedded in the facts.  We review such

factbound determinations for clear error. Farrell Ocean Servs., 681 F.2d at 93. We will respect the trier's resolution of the point unless, on the evidence as a whole, we are left with an abiding conviction that a mistake has been made. McAllister v. United States, 348 U.S. 19, 20 (1954); Carr v. PMS Fishing Corp., 191 F.3d 1, 6 (1st Cir. 1999). When two permissible views of the evidence coexist, the factfinder's choice between them cannot be clearly erroneous. Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990). Moreover, the fact that an appellate court might have weighed the evidence differently is not an independently sufficient ground for upsetting the trial court's determination. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

The district court concluded that the evidence presented by the parties justified a finding of waiver. We proceed to examine that conclusion.

We start with the March 23 letter. That letter is hardly a model of precise draftsmanship. As said, it did not expressly waive the lien (indeed, it did not mention the lien at all). Be that as it may, the letter plausibly can be read as consistent with a waiver of the lien. In the first place, the letter acknowledged that the pre-sale port charges were being controverted in the pending eviction proceeding, indicating that PRPA was looking to that in personam action — and not to enforcement of its lien — for payment. In the second place, since PRPA could not have prevented

SAM from selling the barge, its statement in the letter that it had no objection to a sale could not have been intended to serve any discernible purpose other than to memorialize a waiver of the lien.

Although the letter, standing alone, probably would not be sufficient to show a deliberate intention to relinquish a lien right, the letter does not stand alone. Its meaning is informed by conduct and statements occurring both before and after the letter was sent. Reading the letter as a waiver of the lien finds considerable support in the testimony of those involved in the antecedent discussions. Both González and Sarraga testified that their purpose in meeting with PRPA officials was to secure a waiver and a concomitant agreement to contest the accrued port charges as part and parcel of the eviction proceeding (which, in turn, would allow SAM to sell the barge and accommodate PRPA's request to vacate the berth). They also testified that they clearly communicated this purpose at the meeting and that the PRPA hierarchs who attended the meeting (Rodríguez and Castellanos) agreed to waive the lien. González and Sarraga reasonably understood the March 23 letter as documenting this agreement and reasonably relied on it in representing to prospective purchasers that the KATY-B was free and clear of any maritime liens.

While the testimony of the two PRPA functionaries was inconsistent, it at least partially corroborated these claims. Rodríguez testified that PRPA had told SAM that it wanted the barge

-17-

to leave. He also acknowledged that the letter's allusion to "controverted charges" was a reference to the unpaid dockage fees. Castellanos confirmed that SAM had sought written assurances that PRPA would refrain from enforcing its lien and arresting the KATY-B. He conceded that PRPA knew not only of SAM's plans to offer the barge for sale, but also of the likelihood that any prospective purchaser would rely on the letter as a representation that title could be transferred free and clear of pre-sale port charges.

Finally, the district court pointed to PRPA's delay in recording its lien as evidencing the waiver. The court concluded that PRPA laid in wait, knowing that buyers would treat the March 23 letter as a waiver of lien, and then pounced once a purchaser took the bait. That was a permissible inference. A maritime lien is silent and need not be recorded in order to retain its vitality.[2] See Piedmont & Georges Creek Coal Co., 254 U.S. at 12; Gowen, Inc., 244 F.3d at 69; see also 46 U.S.C. app. § 31343 (providing for permissive recording of a maritime lien). Yet, although PRPA was under no legal obligation to record its lien for pre-sale port charges, it took that step on the day after the sale of the barge. While that could have been a mere coincidence, as PRPA suggests, the trial court was not required to draw so

_____

[2]PRPA asserts that the district court erroneously concluded that maritime liens must be recorded in order to be valid. We do not read the district court's opinion as so holding and, in any event, such an error would have been harmless in the circumstances at hand.

-18-

serendipitous an inference.  Cf. United States v. Doyle, 981 F.2d 591, 595 (1st Cir. 1992) (concluding that, in light of the circumstantial evidence, "[o]ne would have to believe in the Tooth Fairy to think [defendant's action] merely coincidental").  Given the circumstances, the court could permissibly conclude — as indeed it did — that the timing of the recordation, in the face of PRPA's longstanding knowledge of SAM's intention to sell the barge, was consistent with PRPA's realization that its letter would be regarded by prospective purchasers as a waiver of its lien.

PRPA complains that the district court did not give sufficient weight to the testimony of Castellanos and Rodríguez that PRPA neither intended the letter to effect a waiver of its lien nor knew of the sale when it recorded the lien.  But the credibility of witnesses and the weight to be accorded to their testimony are, within wide limits, matters for the factfinder.  See Carr, 191 F.3d at 7.  PRPA's summary of this testimony is a product of selective editing, and the trial court's refusal to accord decretory significance to the testimony favorable to PRPA's position was a classic credibility call.  In the end, the court, leaning heavily on inconsistencies in these witnesses' testimony, concluded that they were "less than credible."  Given the court's unique opportunity to observe the witnesses at first hand, this assessment demands our respect.

The short of it is that the record contains sufficient support for the proposition that PRPA took affirmative steps to make clear an unequivocal intention to forgo its lien for pre-sale port charges and to rely exclusively on the vessel's owner at the time — SAM — for payment. Similarly, the record contains sufficient support for the closely related proposition that PRPA's relinquishment of its lien rights was deliberate and purposeful. Accordingly, PRPA's contention that the arrest of the KATY-B was justified by its lien for pre-sale port charges is unavailing.

**2. Post-Sale Port Charges**. This brings us to PRPA's alternate claim that the arrest of the KATY-B was justified by its inchoate lien for post-sale port charges. This claim is procedurally defaulted.

Admiralty law conceives of a vessel as an entity distinct from its owner, so an in rem action to enforce a maritime lien is brought against the vessel itself rather than against the owner. See Navieros Inter-Americanos, 120 F.3d at 313; see also Tucker v. Alexandroff, 183 U.S. 424, 438 (1902) (stating that a vessel "acquires a personality of her own; becomes competent to contract, and is individually liable for her obligations, upon which she may . . . be sued in her own name"). The Supplemental Rules for Certain Maritime and Admiralty Claims govern the commencement and pleading of in rem admiralty actions. Ordinary notice pleading does not satisfy the stringencies of these rules.

A good example is Supplemental Rule C(2)(a)-(b), which requires that an in rem complaint describe the res with "reasonable particularity" and state that it is within the jurisdiction of the district court. In a similar vein, Supplemental Rule E(2)(a) directs that a complaint in rem must "state the circumstances from which the claim arises with such particularity that the defendant . . . will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." This heightened pleading standard is not some pettifogging technicality meant to trap the unwary, but, rather, a legal rule designed to counterbalance the unique and drastic remedies that are available in in rem admiralty proceedings. See United States v. 384-390 W. Broadway, 964 F.2d 1244, 1248 (1st Cir. 1992).

The inquiry into whether a complaint satisfies this heightened pleading standard comprises a question of law, which engenders de novo review. Id. Undertaking that task, we conclude that PRPA never appropriately pleaded an in rem claim for post-sale port charges. We explain briefly.

PRPA's original complaint — on which it premised the arrest — failed to mention any claim for post-sale port charges (even though that pleading makes clear that PRPA knew, prior to commencing the action, that SAM had sold the vessel). Moreover, the sale took place on June 3, 2004 — but the invoices attached to

-21-

the original complaint show, beyond any shadow of a doubt, that damages were sought only for unpaid port charges through April of 2004.

The amended complaint does not close this chasmal gap. Even though it, unlike the original complaint, contains a count seeking recovery of post-sale port charges, that count did not sound in rem. Count one of the amended complaint is identical to the sole count of the original complaint and prays for an in rem judgment covering the pre-sale port charges. The new count two, however, prays for a judgment referable to the post-sale port charges against S-Bay — and S-Bay alone — as "the new owner of the barge." That count does not assert any claim whatever against the vessel — an omission that is especially telling in light of the precise pleading of an in rem claim in count one.

Fairly read, count two permits no inference other than that PRPA, as expressly allowed by Supplemental Rule C(1), opted to forgo an in rem claim with respect to post-sale port charges in favor of an in personam claim "against [a] person who may be liable" on the latter claim. That reading is not only faithful to the language of the pleading but also makes perfect economic sense. After all, the amount of the accrued pre-sale port charges already far exceeded the fair market value of the barge, so the prospect of reaching a different pocket would have a nearly irresistible attraction to a creditor in PRPA's position.

For these reasons, PRPA's claim that the lien for the post-sale charges justified the arrest fails as a matter of pleading.[3]

**3. Précis.** We summarize succinctly. The district court's determination that PRPA waived its maritime lien for pre-sale port charges is based on plausible inferences from the record and, accordingly, is not clearly erroneous. Given PRPA's failure properly to plead post-sale port charges as an alternate basis for an in rem claim, the district court's vacation of the arrest is unimpugnable.

## III. THE REMAINING CLAIMS

PRPA also ascribes error (i) to the district court's determination that PRPA prosecuted the arrest of the KATY-B in bad faith and (ii) to the award of attorneys' fees to S-Bay as a sanction. In the present posture of the case, we lack jurisdiction to consider these remonstrances.

---

[3]This conclusion renders superfluous any consideration of (i) whether PRPA's lien for post-sale port charges has been rendered moot by payment, see, e.g., Matos v. Clinton Sch. Dist., 367 F.3d 68, 71-72 (1st Cir. 2004) (explaining that when intervening events render an appellate court incapable of providing effective relief on a particular claim, the claim has become moot and, therefore, nonjusticiable); (ii) whether the posting of a bond covering the post-sale port charges rendered moot any attempted reliance on those charges to justify the arrest of the vessel, see generally Fed. R. Civ. P. Supp. R. E(5) (outlining procedures for securing the release of an arrested vessel through the posting of a bond); or (iii) whether the fact that the amended complaint was not filed until eleven days after the arrest of the barge (and so could not have been relied on by PRPA at the time of the arrest) undercuts PRPA's argument.

We previously have indicated, albeit in a case involving a non-party, that a finding of bad faith and a consequent imposition of sanctions is not immediately appealable as long as other issues in the case remain pending in the district court. See United States v. Kouri-Perez, 187 F.3d 1, 11-14 (1st Cir. 1999). In the usual case, we think that the same rule applies to a finding of bad faith and a consequent award of sanctions against a party. Cf. Appeal of Licht & Semonoff, 796 F.2d 564, 568 (1st Cir. 1986) (concluding that "a party may not appeal a sanction order other than criminal contempt before final judgment"). That interpretation would be consistent with Catlin, 324 U.S. at 233, which stands for the proposition that a "final" order is one that ends the litigation on the merits and leaves nothing to be done but for the execution of judgment.

The fact that this is an admiralty case within the purview of 28 U.S.C. § 1292(a)(3) does not alter the jurisdictional calculus. As PRPA conceded at oral argument, the bad faith finding neither addresses nor resolves the merits of the sole claim asserted at the post-arrest hearing. Unlike the order vacating the arrest, the bad faith finding is not a determination that the barge's arrest was invalid but, rather, an ancillary ruling that PRPA's prosecution of that claim left something to be desired. Consequently, the bad faith finding is not independently appealable under section 1292(a)(3). See Doyle v. Huntress, Inc., 419 F.3d 3,

7 (1st Cir. 2005); Martha's Vineyard Scuba Headquarters, 833 F.2d at 1064.

The sanctions award is at yet a further remove. That award is ancillary to the bad faith finding and, thus, ancillary to an ancillary issue. Because it does not finally resolve the merits of any claim or defense in the underlying action, it too is not independently appealable under section 1292(a)(3). Cf. Cement Div., Nat'l Gypsum Co. v. City of Milwaukee, 915 F.2d 1154, 1158 (7th Cir. 1990) (holding that an order disqualifying counsel was not independently appealable under § 1292(a)(3) because it did not resolve the underlying dispute between the parties).

In view of the lack of any independent jurisdictional basis, these remaining challenges to the district court's ruling are properly before us if, and only if, they come within the narrow confines of pendent appellate jurisdiction. Instances in which the exercise of pendent appellate jurisdiction is appropriate are hen's-teeth rare. These instances arise only when (i) a non-appealable issue is inextricably intertwined with one or more appealable issues or (ii) review of a non-appealable issue is essential to ensure meaningful review of an appealable issue. See Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995); Limone v. Condon, 372 F.3d 39, 51 (1st Cir. 2004).

Neither condition obtains here. The fact that we already have resolved PRPA's challenge to the district court's vacation of

the arrest without any substantive reference to either the bad faith finding or the corresponding award of sanctions proves conclusively that the issues are not inextricably intertwined. See, e.g., Limone, 372 F.3d at 51; Suboh v. Dist. Attorney's Office, 298 F.3d 81, 97 (1st Cir. 2002). By the same token, the efficacy of our decision not to reinstate the arrest order is in no way dependent on the exercise of simultaneous appellate jurisdiction over the remaining issues.

In a nutshell, the bad faith finding and the corresponding award of sanctions do not qualify for the exercise of pendent appellate jurisdiction. This conclusion, coupled with the fact that those issues are bereft of any independent basis for interlocutory review, means that they must await an end-of-case appeal.

## IV. CONCLUSION

We need go no further. To recapitulate, we hold that we have appellate jurisdiction over the portion of the district court's order that vacated the arrest of the vessel, but not over the remaining issues raised by PRPA. As to the single issue that we have jurisdiction to resolve, we hold that (i) the evidence suffices to support the district court's finding that PRPA waived its maritime lien for pre-sale port charges and (ii) PRPA's failure properly to plead an in rem claim for post-sale port charges obviates any afterthought assertion that the district court erred

-26-

in not sustaining the vessel's arrest on the basis of those charges.

**The appeal is dismissed in part for want of appellate jurisdiction.  As to the portion of the appealed order over which this court has appellate jurisdiction, the order is affirmed.  Costs shall be taxed in favor of the appellee.**